For the lawyers, we'll call our first case of the morning, Safarian v. American DG Energy and Multiservice Power Inc. Thank you. Good morning, Your Honors. Good morning. Before you begin, let me take a matter of personal privilege to speak on behalf of our court and recognize our dear colleague, Judge Rendell, who is sitting with us for the last time as an active judge. Judge, fortunately, she will be with us for many, many years, serving as a senior judge in the grand tradition of senior judge. But Judge Rendell has been a judge of the United States for over 20 years now. She were on the bench when she was 13.  She has been a model colleague, a great friend and teacher to all of us. And she's done all that service to the judiciary while also having a few other small roles, including First Lady of Pennsylvania and serving on charitable and civic boards, too numerous to mention. So she is a great American patriot, a hero of mine, a dear colleague and friend. And I know I speak for the whole court when I say that. Mitch, we love you. Thank you. Thank you so much, Tom. That's very sweet. I will say that as the second most senior active judge on the court, I end up presiding all the time. So it's going to be very different being one side or the other. The other thing is at a conference we have a tradition that the junior judge goes first. So I've had the unenviable problem that in conference, as the second most senior judge, I speak last. And the two have already decided the case before I can give my dissent. So now I will suddenly speak first and we'll do some long talking and convincing before I turn the conference over to others. So thank you, Tom. That's wonderful. I really don't think of myself, I'm stepping out, not stepping down. So I will reduce my load from five sittings to four sittings. So I hope it's going to be not much of a transition. But thank you. It's been an honor to be active with all my judge colleagues. Thank you. And I certainly want to echo Judge Hardiman's sentiments as expressed so ably here today. I have had the pleasure of knowing Judge Rendell from the beginning of our judicial careers. We both had our confirmation hearings as district judge nominees on the same day. And Judge Finansky was also 13. You can see that the judiciary has beaten me up more than Judge Rendell. In any event, if there ever was the definition of a person with class, it's Judge Rendell. And it certainly has been a privilege to have been associated with her now for more than 20 years. Thank you. Thank you. Thank you. All right. That said, would you like to reserve time for rebuttal? I will give no rebuttal to what was just said. Not for that. But at the end of the case, yes, I would, Judge. Thank you. Two minutes? Two minutes. Okay. That's fine. Thank you. Also, there's a split of time between myself on behalf of Appellant and the Department of Labor. I'm going to try to focus on the state law claims. He's going to try to focus on the federal law claims. However, if you have any questions of me regarding the federal law claims, absolutely I'm here to answer them, Judge. All right. Thank you. This is an appeal from an employment case from the District of New Jersey. It's an appeal from summary judgment. The district judge, I think, ably framed the issue on page four of her opinion. The first two sentences of her section that says analysis is, I quote, Most of the plaintiff's claims turn on his employment status. Therefore, the court will first examine whether the plaintiff is an employee or an independent contractor. And that comes down to the crux of virtually all of most of the claims. Okay. It has to do with the factors, what we call the Martin factors or whatever we want to call them, correct? Yes, Judge. And how did Judge Thompson improperly, I guess you would say, analyze? Well, Judge, the next page has, I think, the summary of her analysis. And the Martin is just one test, and we're dealing with three and probably four tests here. But she only applied the federal test. She did not apply any state law test. That is correct, Judge. But we have other counts under state law which have their own tests, which the New Jersey Supreme Court articulated. Right, but that's not before us. We review what the district court does. If she didn't apply those tests, we're going to have to remand on that aspect. Judge, I believe that's absolutely correct. I believe that your decision, this court's decision several weeks ago in the follow-up to the Hargrove v. Sleepy's case, is exactly the right outcome for this case on at least the state law matters. Well, what are you asking us to do? We're asking you to remand the case, Judge. Vacate and remand? Yes, Judge. What about the federal application of the Martin test? The Martin test, Judge, I think that that also was released. And for those of you in the audience, let's explain. The tests here are for whether someone is an independent contractor or an employee. Correct? Correct, Judge. And you would contend that although Judge Thompson decided that he was an employee, that proper application of the Martin test would dictate that he is an independent. I mean, the opposite, the opposite. She said independent contractor, and the Martin test, you say, would require he's an employee. Yes, Judge. Well, then tell us why you were correct. Sure. The Martin test was correctly utilized, incorrectly applied. The judge, when she explained her analysis, said, here the question of employment status is far from straightforward. That by itself begs the question, if there is a question which is far from straightforward, is it right for summary judgment? And the case law, I believe, says no. But she goes on to say that some facts of the relationship, such as the continued and exclusive relationship, the importance of the service to the business, payment on a per hour basis, the provisions of the uniforms, tools, and a phone, are often associated with employee relationships. However, plaintiff structured his relationship with defendant as an independent contractor and gained certain benefits that come with that status. The Martin test is the economic realities test. And the economic reality of this was he was a full-time employee. They wanted somebody there full-time. They wanted somebody there that they controlled. They wanted somebody there wearing their uniform. They wanted somebody that they would pay by the hour. When he went to Russia, he was working full-time for this company? No, Judge, he had been. We don't go hear cases in, you know, Mexico or Russia. I mean, he went to Russia. How could he possibly be an employee of this company while he was in Russia? It's a good question. During the course of a three-and-a-half-year relationship in which he was told at the beginning and which he constantly asked to be made an employee and was constantly denied that. Well, I thought twice he was offered employment and denied it. That's at the end, Judge, and that's kind of a separate issue than Russia. That speaks pretty loudly that he's not an employee. When somebody offers to make someone an employee and they say I respectfully decline your offer of employment? Well, first I'll go to Russia, then I'll talk about the decline, if Your Honor wishes me to do that. The point of the matter is when he was not made an employee, he was told he was going to be. He wasn't at this point. He went to Russia. Went to Russia for two months. When he went to Russia, he was an employee. Multi-service didn't go to Russia. Michael Safarian went to Russia for two months. He came back. He was told he'd be an employee. He wasn't. The certification and deposition of Edward Miller. Wait, are you saying he was working for ADG in Russia? No, no, no. He was an employee of someone else, but he was an employee. Multi-service employment with ADG ceased for that two-month period? It did, Judge. Who paid him while he was in Russia? His Russian employer, Judge. Not multi-service? No, he was not paid by multi-service. And speaking of multi-service, can you cite any case from any jurisdiction, state or federal, where somebody does work for Company A and is paid by Company B but is deemed to be an employee of Company A? I couldn't find one. Well, Judge, I don't have the exact cites that were given, although that was the issue in the Sleepy's v. Hargrove case. But the point is it's the economic reality. And I believe Martin itself says you don't. But is that a no to my question? The no is I don't have the cites right off the top of my head, Judge. So the answer is there are cases like that, but you don't know what they are? I don't have them at the tip of my tongue. That's correct, Judge. Yes, there are. No, I don't have them. Are they in your brief? I believe they are. They're cases where people incorporated, they were paid by a company, did work for somebody else, and were deemed to be an employee of the company that didn't pay them. But, Judge, the focus of the test is the economic realities, and it says it's not the form of the payment. I understand that, what the economic realities test is. I'm asking if there's any case out there that fits the fact pattern here, namely where someone is paid by Company B and doing work for Company A and deemed an employee of Company A because this seems like a classic subcontractor situation. There are plumbers and electricians all over America who spend month after month, year after year sometimes, working on one job in one location, but they're not deemed to be employees of the general contractor, nor are they deemed to be employees of the party that hired the general contractor. Judge, I think maybe perhaps a more appropriate and much more widespread example is truck drivers. I use that because of the Hardorff case, but it's also a frequent tactic. Trucking companies and garbage companies will have their drivers form an LLC and pay them there, even though the economic reality is they're forced to work exclusively for this one company. So is there evidence in the record that he was required to form multi-service? Multi-service existed beforehand. He met with Stewart Temple. He didn't want to work as a contractor. He wanted to be an employee. He met with Stewart Temple. Okay, go ahead and finish that. Sure, Judge. The evidence is that when he had his interview, he was told he would be an employee by Stewart Temple, but then when he came on board, they said, well, we're going to pay you through multi-service. And he constantly asked and said, you told me this, and they never changed it. But there are two instances where he was offered employment that he rejected. Sure, Judge. Can you explain that to me? I can. If you go to the certification and deposition in the record of Edward Miller, who was his supervisor at the time, he said that he spoke with the president of the company, and they agreed on terms, the president and the supervisor. He went and made that offer to Mr. Safarian. Mr. Miller, in sworn testimony, says that Mr. Safarian accepted. Then there was a letter that came back in which the terms were different. They were not what was agreed to and what was approved by the president of the company. So Mr. Safarian said, these are not the terms. There was another letter, and that was accepted. There's debate about whether it was accepted too late, but it was accepted. But before any of that happened, he accepted the verbal offer. All right. All right. We'll hear from you on rebuttal. Thank you. Thank you. Good morning. My name is Dean Romhill, and I'm an attorney at the Department of Labor. We are, as amicus, supporting Mr. Safarian in this case, and particularly we are concerned with the district court's legal analysis in granting judgment to ADG Energy on the FLSA and Sarbanes-Oxley's claim. The concern with respect to the FLSA claim, whether he was an employer or an independent contractor, is that although the district court identified the Martin test as being the applicable test and noted some evidence that goes to the economic realities of the relationship, showing that he was an employee, it then turned, it said, however, and focused on the structure of the relationship. Every relationship has a structure or a form, and the point of the Martin analysis, as this court has said, is to go under that, is to focus on the realities of the working relationship and see if whether the employee, the worker, is economically dependent on the employer or not. And the trial judge did mention some of those realities, including he was highly compensated. He incorporated. He took, ran certain expenses through multi-service, the company he incorporated. He had certain tax benefits from the company. Those were all mentioned by the district court, were they not? They were, but we don't think that those are, those don't really focus on the economic realities of the working relationship. For example, whether he's highly paid or not doesn't go to whether he's an employer or an independent contractor. It may, as the Supreme Court has said in the Barentine case, I believe, even highly compensated people. That's not just positive, but it's clearly an issue. I mean, these laws were, partly for Martin, but I thought these laws were passed in order primarily to protect workers who had no bargaining power. Isn't that fair? I think that's a fair assessment of the purposes of the FLSA. People who had no option who were being taken advantage of by their employers, this gentleman doesn't fit that profile. The concern is that the court relied solely on the structure of the relationship to find that he was an independent contractor. And you're saying she needs to, would we send it back for her to analyze the six factors, or would we do it ourselves? Well, we've asked for remand to the district court to analyze those six factors. Obviously, it mentions certain evidence, such as the continued and exclusive relationship. It mentioned the fact that his work was integral to the work that ADG Energy did. It mentioned that he was paid by the hour, and it mentioned that ADG supplied certain equipment materials to him as factors. Well, you're not part of the economic realities that it was multi-service that billed on an hourly basis for the work that he was performing. That's not unusual in the context of a contractor. That can't be. The problem is that the court relied on that structure solely and allowing employers voluntarily and involuntarily to impose that structure on a relationship to get out. Wait a second. You say voluntarily or involuntarily. If that's what the plaintiff wants in a particular case, I would rather have this structure because I get these tax benefits. Why now do we say it doesn't matter what the plaintiff wanted. This was really an employer-employee situation. Let me address that issue. I think Judge Hartman raised the same point earlier. The issue is that an employee can't voluntarily disclaim away their rights under the FLSA. Even an employee who says sincerely, I am not an employee under statute, you still need to focus on the actual relationship between the employee and the employer or the worker and the employer to see if he or she is an employee or not. Does the worker have the freedom to arrange his or her affairs in such a way that he is an independent contractor instead of an employee? I think the worker certainly has his or her freedom to arrange his or her affairs and how she is paid in any way possible. Isn't that the crux of Judge Vadaski's question, that this gentleman arranged his affairs in that way to be an independent contractor? I don't know what his intent in arranging affairs that way were, but yes, a worker can certainly arrange the affairs in a way that doesn't change his status under the law, whether he or she is an employee or an independent contractor. It's not something to be contracted out of. For purposes of this law. For instance, from a tax standpoint, he's probably okay dealing through multi-services, et cetera, et cetera, but we're talking about the test under the FLSA. Frankly, the FLSA's test I think is broader than the IRS definition. We obviously, the Department has no opinion on whether he was an employee or an independent contractor for IRS purposes. The concern is that, as the Supreme Court said in the Tony and Susan Malama Foundation case, the workers' protestations that they are non-employees, however sincere, can't take them outside the ambit of the FLSA. We're just concerned. We see independent contractor agreements that are agreements that workers have to sign to get work signed by independent contractors. Is that in this case? I don't know if that's this case. You're participating in this case. You've read the record. Right. Is there any evidence that this is a case like that? As I understand the evidence and the arguments, yes, there is evidence that he was not voluntarily, that the relationship was not voluntarily, that he wanted to be an employee. He was forced to make all that money. From our perspective, it doesn't matter. They force him to go to Russia and work for a different company and get paid there? Of course not, but from our perspective it really is. What does that say about the exclusivity? You said a few minutes ago he had an exclusive relationship with ADG. How is that correct in light of the fact that he spent two months in Russia? Well, I think those were the district court's words, continued acting as an exclusive. The point is looking at the entire three-and-a-half-year employment relationship. Let's try a three-and-a-half-year working relationship. And to look at that, does that suggest a permanence and an indefiniteness, or does it suggest a sort of by-the-job and not a much more casual relationship? And we think that a three-and-a-half-year relationship, even with a two-month gap, on the whole suggests permanence as opposed to a lack of permanence. Can I ask you to address Dodd-Frank? Sure. We don't have much time, but I'd like to know your view. Your brief argues that it's being viewed too narrowly. And yet you cite a lot of cases that I've read that have upheld the allegations in different situations. But I've never seen an allegation quite as thin, if you will, as this one. The allegations in the complaint do not indicate that Sefarian had a reasonable, subjective or objectively reasonable belief that these fit under one of the six categories of sub-anoxy. And it seems to me that this complaint and his allegations that there was some double billing, if anything, it shows that they were negligent or they had some problems, but nothing rising to the level of mail fraud or wire fraud. Are you urging that the allegations of this complaint satisfy Dodd-Frank? May I respond? Yes, please. I'll give you another two minutes on this. I think our concern with respect to the Dodd-Frank claim is that the way – the district court didn't frame its decision against Mr. Sefarian, the Dodd-Frank claim, as a lack of evidence or a lack of proof. It said that these type of disclosures aren't protected. It said protecting these disclosures being consistent. And it said actually that it didn't involve shareholders and it didn't – it wasn't an accountant. He wasn't an accountant. He wasn't a lawyer. So that's – your complaint is that the holding is incorrect, but you're not saying specifically that this complaint satisfies Dodd-Frank. What we would like is that for the Dodd-Frank claim to be remanded – I mean, our big concern is that an engineer who brings complaints of overbilling can engage in protected activity under SOX. What the district court didn't do here is, I think, make the analysis that you mentioned, which is determine whether the statutory standards met, whether he complained of conduct that he reasonably violated one of the six categories of law. And that's our concern. The district court didn't get to that point of the analysis. And sort of short-circuited the analysis based on his position and based on the subject matter of his complaint. And we think the type of complaint that he raised and the fact that he's an engineer and not an accountant or lawyer doesn't preclude him from engaging in protected activity. The actual complaint needs to be analyzed. Okay. Thank you. Thank you. Thank you, Your Honor. May it please the Court, Rod Honaker from Wendell's Marks on behalf of the appellee, American D.G. Energy. Your Honors, Mr. Saffarian was an independent contractor because he chose to be an independent contractor. But the whole point of the six-factor test is to look at the economic reality of the relationship between the putative employer and employee such that the structure really doesn't matter. That's pretty much what the cases are saying, isn't it? Yes, Your Honor. And Judge Thompson considered the totality of the circumstances. She said so in her decision. Where did she analyze the six factors of Martin? She did not check through each one. Okay. Well, don't you have to? The degree of a defendant's control, employee's opportunity of profit and loss, employee's investment in equipment or materials, whether the service rendered requires special skill, degree of permanence, integral part. I mean, there are six tests. Don't you have to go through them and say, okay, this one favors this, this one favors that, and on balance you come out with a conclusion? The judge said that based upon the review of the record and the factors set forth in the Martin test, the court concluded that Mr. Safarian was an independent contractor. Yes. She also talked about his admitting and that he rejected employee status and structure, which are not relevant considerations. Well, with respect to his rejection of employment, I do believe that is a relevant consideration because it goes to the economic reality. He chose to funnel all the money through multiservice. He made aggressive use of the deductions available. That's not one of the tests, though. That's not in Martin. Well, when you look at the totality of the circumstances and the opportunity to make a profit or loss, which is one of the second factor under Martin, it's certainly relevant. But maybe it was outweighed by the others. She didn't do any balancing or any assessment, counterbalancing one against the other, did she? I think she was looking at the qualitative analysis of the admissions of Mr. Safarian. Multiservice, preexisting. How do we know that? Don't we have to send it back and say, listen, we've got these factors, you said this, we can't tell exactly how you arrived at your conclusion. She cites to several admissions on the part of Safarian the existence of multiservice, the use of the taxes, the use of helpers. But, see, those aren't economic realities. Those are individuals trying to put themselves into a certain status for their own benefit. He may have thought here that he was going to hurt himself tax-wise if he did say, oh, yes, I'm an employee. But Fair Labor Standards Act has an independent test that has nothing to do with the admission of a person or the structure. Isn't that correct? Well, if I might focus on the elements that Judge Thompson cited to, one of the things she cited to was his use of helpers. No employee brings along a helper with them to a work site and bills them out. I think that raises a more fundamental question. Did you concede below that Martin is the exclusive test here? Because one of the things I'm wrestling with is when we apply the Martin factors are applied by the district courts and we review them, typically there's no clear definition as to whether someone's an employee or an independent contractor. It's very vague. I can't find other cases where somebody incorporated and, you know, again, company A, he does the work for A, but B pays him. Are there any cases out there like that? And did you argue to the district court that this is a qualitatively different situation than the typical case by virtue of the separate incorporation? Yes, Your Honor. And we also pointed out, and I might cite to the U case, U.V. McGrath from the Third Circuit, 2014 Westlaw 7384328. It was a case cited by the Department of Labor. I believe that's a situation where the contractor set up a company, billed through the company, and was deemed to be a contractor, not an employee. So there are cases out there, but they're not cases that find employee status. They're cases that find – yes, Your Honor. What we argued below was – So I guess what I'm getting at is do the Martin factors apply in the typical way in a case like this where there's a separate incorporation, or does it not quite fit? What's your view on that? My view is that this case is not like the Sleepy's case, for example, which I realize is a New Jersey wage and employment case. I think what the statutes, whether New Jersey wage and labor, FLSA, were going after was a situation where you had a very large, larger employer who's taking advantage of lower-income employees, forcing upon them an independent contractor agreement like they did Sleepy's, and then using that structure, that label, to categorize them. This is a different situation. This gentleman is a professional. He's licensed, highly credentialed. He made – But he's still entitled to the protections of the FLSA. So the question becomes how do we evaluate it, and how should the district court evaluate it? Is the district court required to only consider the Martin factors, or can the district court consider other factors that might not fit within the six categories? I believe the six categories of Martin should be applied. However, application of them in totality and viewing them from a qualitative basis leads to the conclusion that he was a contractor. How is that? Let's run through those. How do you see that it comes out that way? Control. Okay. He was working off-site the entire time. He didn't receive any written instructions. They told him where to go and what to do and what he was doing. They told him where to go. But after that, he had tremendous discretion to evaluate any problems, to – Of course, that's just applying his own knowledge. But, I mean, he worked for them and took his orders from them, did he not? Well, at some point he would have to, for example, get approval in order to apply a fix that wasn't a standard fix. Well, tell me how his – what he did differed from people who were employees. My recollection is the record shows that he was treated exactly the same as others who were clearly employees. Is that correct or not? Well, in certain respects. In terms of the degree of control? No. He drove his own truck to the work sites, for example. The employees who he was comparing himself had a company truck. I don't think that has to do with control. I'm talking about day-to-day. His work was the same as other people. He was sent to job sites just the same as other employees were sent to job sites, et cetera, et cetera. He was sent to job sites. He had a greater degree of discretion in diagnosing problems, for example. Where's that in the record? I believe we cited to his answer to interrogatory 18, which he himself went through what his job duties were. And you'll see they're a very high level of technical sophistication. Because he's a skilled person. So were other employees skilled persons? I don't believe any of the other employees were a direct match with what he was doing for ADG. The other important factor is opportunity for profit and loss. As I said, he had the opportunity for profit and loss. That's why he was funneling everything through multi-service. That's why he was using helpers. Investment. These were all his own tools, his own equipment. I'm not sure when he got on site he would be working on ADG equipment. But it was all his own tools. And he took tax deductions, depreciation for those. Special skill. The Department of Labor in its amicus brief acknowledges a high level of skill. The fifth factor, permanence. Two months in Russia. He worked exclusively for over three years other than those. There were some other jobs that he did, Your Honor, and he had the freedom to do that. Integral part, we've conceded that what he did was something standard done. He was there boots on the ground and the face of the company. Right. That's from the certification of his former manager that was drafted by Mr. Sperry's counsel. His work was critical to the mission of the company. I mean, he was fixing these problems that the company needed fixed. It was important, but he was other people. Another contractor was hired to fill his slot when he left. So it wasn't exclusive to his skill. Again, with respect to the state law claims, Your Honor noted that the judge appeared to only apply the Martin test. Our contention, and, of course, under SEPA, we use the Pukowski and D'Annunzio test, the 12-point test. But when you line up the 12-point test to the 6-point test, they're largely similar. I would argue that they're essentially just an FLSA Martin test. It's just a more concise elaboration on the contention. But we review what the district court does. Don't we need the district court in the first instance to say what you said, that is, that, oh, well, they really come out the same way? And there are, whether the worker accrues retirement benefits, whether the employer pays Social Security taxes, I mean, those are things that we can't analyze in the first instance, can we? I don't believe the court has to remand this matter to apply tests and considerations that I think are crystal clear that the district court already considered. Well, whether the worker accrues retirement benefits and whether the employer pays Social Security taxes, the district court really didn't get into that and didn't weigh that against other things. When you have 12 factors, it could be 7 and 5. It could be 8 and 4. And unless we have the district court's view as to how these match up, it's tough for us to do that in the first instance. Both of the factors you just mentioned would favor ADG and a finder of contractor status. Under both Morton and D'Annunzio, it's a totality of the circumstances and a qualitative analysis. Of the factors. Of the factors. So these are guideposts. So does that mean if only two factors go in favor of your client but they're overwhelmingly important, that that can outweigh the other 10? Yes. Yes, Your Honor. That's our position. But the district court wasn't particularly explicit in that regard. That's fair, right? That's fair, Your Honor. Yes. So it sounds almost like you're asking us to affirm based on the record more so than affirm for the reasons stated explicitly by the district court. Is that fair? I think that's another fair statement, Your Honor. Yes. Okay. Yes. I don't know if Your Honors would like me to address Dodd-Frank. If you'd like to. Yes. How does this allegation in the amended complaint satisfy Dodd-Frank? It does not. It's very vague. Overbilling. By the way, in the record, there's not a single specific incident and a date where he says they're overbilling on X or Y. Nothing in writing. The plaintiff, what Mr. Saffarian has said, is that the overbilling could eventually lead to inaccurate corporate disclosures and tax returns. However, as Judge Thompson pointed out, that's a bridge too far, way too far. Any allegation of overbilling or overcharging by a retail outlet under those circumstances could set forth the basis of a Dodd-Frank claim. Judge Thompson was concerned about overbreath. And I do want to note, almost all the cases cited in the DOL amicus brief are motions to dismiss or Department of Labor administrative cases, not summary judgment cases with a fully developed record. So our case is different in that regard. Mr. Saffarian did not advance a Dodd-Frank claim until he amended his complaint in connection with the Lawson U.S. Supreme Court decision, which held that an independent contractor could be covered by Dodd-Frank. And we would respectfully submit that that's why the allegation that overbilling can lead to inaccurate corporate disclosures is really so thin that there's nothing there. It was an afterthought. Your Honor, the District Court should be affirmed in all respects. Thank you very much. Thank you. Butler? Mr. McLaughlin? Mr. McLaughlin, Mr. Honaker made a pretty good run-through of the Martin factors coming out in favor of a finding that there was no employment relationship. How would you, where did he go wrong? Well, Judge, I think that the District Court pretty much nailed it. All the factors go towards employment status with the exception of the form. And if we focus on the form. He didn't say, let's talk about what Mr. Honaker said. He said the degree of control went the other way, opportunity for profit and loss went the other way, investment equipment went the other way, special skill went the other way. How do you come up saying that they go in favor of employment status? Let's start with control. Mr. Sparrian was told where to go, what to do, when to do it, what his hours were, what he had to wear, what his business card was, use the company phone. He was told where to get his supplies from and it was paid for by the company. Okay, profit and loss. Judge, a company profits by running itself more efficiently so that it can engage in efficiencies, so that it can squeeze its costs and maximize its profits. But he didn't have his opportunity for profit and loss. He didn't have that. He was paid by the hour, Judge. He had no opportunity for profit and loss. He went there. He was told what to do. He was told when to do it. He got paid. He set hourly amount. Multi-service didn't have the discretion to decide how many hours that Safarian worked? You're saying he wasn't free to work for other people? No, he wasn't. The entire time that he was there, Judge. He formed the company before he even started working for ADG. Three years. He did heating and air conditioning. So beforehand. He controlled multi-service and he controlled where he worked. Not while he was working for ADG. So ADG sent him to Russia? No, Judge. So who sent him to Russia? He went on his own, not through multi-service. And how many other employees were at ADG? How many employees did ADG have at the time Safarian was working there? I believe it was about 12 to 15. Okay. And how many of those employees took a sabbatical? That's not in the record, Judge. How many of those employees hired a helper? I don't know that any did. It's not in the record either way. So Safarian, his behavior was, at least in those two respects, remarkably free and different than the employees of the company. Wouldn't you concede that? No, Judge. He quit. He left and worked for two months. He was called back. Any employee can quit and any employee can be called back. And he didn't take multi-service and do work for multi-service. He did. He was an employee. I don't know whether they do use W-2s or how that was structured. He was an employee, though. He wasn't paid by multi-service. And, in fact, the entire time, from start to finish, including to Russia, he wasn't paid by multi-service? Not while he was in Russia, Judge. Okay. But all his checks, when he was doing work for ADG, all his checks were paid by multi-service. Yes, that's correct. He never received a check from ADG. That's correct. Any benefits from ADG? No, Judge. That's one of the points. But the entire three-and-a-half years, from start to finish, that Mr. Safarian worked for ADG in whatever form it's called, he made almost $400,000 from that work. Multi-service was paid. Multi-service was paid $6,000 over those three-and-a-half years. And one of those jobs was Mr. Safarian fixing, putting in an air conditioning unit for his pastor. The definition is suffer or commit to work, Judge. If the court were to allow an employer to say, you be paid through an LLC, every employer could make every worker fall outside the protections of the FLSA. But it's not defined as what the form is. It's defined as suffer or commit by Congress. And that's why the economic realities have to predominate. It has to be substance or reform where an employer can take anybody out of the protections of the FLSA. Okay. I think we have your argument. Thank you very much. Thank you, Your Honor. Did you want to hear anything else on Dodd-Frank? No. Thank you. Thank you, Your Honor. Cases well-argued, we'll take them under advisory.